In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 14-1825 *et al.*

LU JUNHONG, *et al.*,

*Plaintiffs-Appellees*,

*v.*

THE BOEING COMPANY,

*Defendant-Appellant*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 13 C 7421 *et al.* — **Harry D. Leinenweber**, *Judge*.

ARGUED JUNE 26, 2014 — DECIDED JULY 8, 2015

Before WOOD, *Chief Judge*, and CUDAHY and
EASTERBROOK, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. On July 6, 2013, a Boeing 777
hit the seawall that separates the ocean from the end of a
runway at San Francisco International Airport. The plane's
tail broke off, 49 persons sustained serious injuries, and
three of the passengers died, though the other 255 passengers and crew aboard suffered only minor or no injuries. The

flight, operated by Asiana Airlines, had crossed the Pacific Ocean from Seoul, Korea. The National Transportation Safety Board concluded that the principal cause of the accident was pilot error: the pilots approached too low and too slow, and by the time they attempted to add power and execute a missed approach, it was too late. Only three seconds remained until the impact, the plane was about 90 feet above the ground, and the "airplane did not have the performance capability to accomplish a go-around." *Aircraft Accident Report: Descent Below Visual Glidepath and Impact with Seawall, Asiana Airlines Flight 214* (NTSB June 24, 2014) at 126. The Board believed that the pilots would have had to act eight or nine seconds earlier (a total of 11 or 12 seconds before reaching the seawall) to avoid hitting it. *Id.* at 84–85.

Suits brought in federal courts in California, and some other district courts, were consolidated by the Panel on Multidistrict Litigation in the Northern District of California under 28 U.S.C. §1407(a). Some passengers filed suit against Boeing in state courts of Illinois, contending that the plane's autothrottle, autopilot, and low-airspeed-warning systems contributed to the pilots' errors. Boeing removed these suits to federal court, asserting two sources of jurisdiction: admiralty, plus federal officials' right to have claims against them resolved by federal courts. 28 U.S.C. §§ 1333, 1442. The Panel on Multidistrict Litigation then decided that these suits, too, should be transferred to California to participate in the consolidated pretrial proceedings. But before receiving the Panel's formal directions to transfer the suits to California, the district court remanded them for lack of subject-matter jurisdiction. 2013 U.S. Dist. LEXIS 175699 (N.D. Ill. Dec. 16, 2013), reconsideration denied, 2014 U.S. Dist. LEXIS 50210 (N.D. Ill. Apr. 11, 2014). The court concluded that Boeing did

not act as a federal officer for the purpose of §1442 and that the tort occurred on land, when the plane hit the seawall, rather than over navigable water. Boeing appealed, as it is entitled to do: removal under §1442 is an exception to 28 U.S.C. §1447(d), which makes most remands non-reviewable. We stayed the remand orders.

# I

First in line is the question whether Boeing was entitled to remove under §1442(a)(1), which offers a federal forum to "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office". Boeing obviously is not the United States, a federal agency, or a federal officer, but it maintains that it is a "person acting under [a federal] officer" because federal regulations require it to assess and certify the airworthiness of its planes.

Boeing contends that it is "acting under" the Federal Aviation Administration because "the FAA has granted Boeing authority to use FAA-approved procedures to conduct analysis and testing required for the issuance of type, production, and airworthiness certifications for aircraft under Federal Aviation Regulations. In carrying out those functions, Boeing is subject to FAA control, and it acts as a representative of the FAA Administrator." Instead of sending a cadre of inspectors to check whether every aircraft design meets every particular of every federal rule and policy, the FAA allows Boeing (and other firms) to do some of the checking itself. In particular, Boeing maintains, FAA Order 8100.9A authorizes and requires it to analyze the adequacy

of its autopilot and autothrottle systems and certify that they meet the regulatory requirements of 14 C.F.R. §25.1309.

It would be linguistically possible to call self-certification a form of "acting under" the FAA. Yet all businesses must ensure that they comply with statutes and regulations. Sometimes they use the information internally, to decide whether they must make changes. Sometimes they must certify compliance. For example, Boeing's brief on this appeal closes with three certifications: (1) that the brief was properly filed with the court and served on opposing counsel; (2) that the portions subject to a length limit contain 11,882 words and that it meets the typeface requirements of Fed. R. App. P. 32; and (3) that all of the materials required by Seventh Circuit Rule 30 have been included in the appendix. Would Boeing's lawyers say that these certifications make Boeing (or its law firm) persons "acting under" the judiciary? Yet certifications just demonstrate a person's awareness of the governing requirements and evince a belief in compliance. Judges often call lawyers "officers of the court," but no one should think that this means that a lawyer can use §1442 to remove a state-law malpractice suit to federal court. A figure of speech does not make someone a federal officer or a person "acting under" one. See *Howard v. St. Germain*, 599 F.3d 455 (5th Cir. 2010) (treating a lawyer's invocation of §1442 as sanctionably frivolous).

This analysis implies that the right question is whether being subject to governmental requirements is enough to make a person one "acting under" the author of those regulations, for the purpose of §1442. And we know from *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007), that being regulated, even when a federal agency "directs, supervises, and moni-

tors a company's activities in considerable detail" (*id*. at 145), is not enough to make a private firm a person "acting under" a federal agency.

Watson sued a cigarette manufacturer, contending that it had cleverly manipulated the testing of its products to show low levels of tar and nicotine. The manufacturer contended that, to the contrary, it had tested exactly as federal officials required and that any deviation from those protocols was forbidden. As an entity merely following orders, the manufacturer asserted, it should be treated the same as the agency that issued the orders. The Court observed that regulation is ubiquitous, and much regulation can be called complex; if following federal rules allowed litigation in federal court, then all food and drug suits, and many others too, would be removable. The Court thought that neither the language nor the history of §1442 justified reading it to cover the activities of regulated businesses. Instead, the Court concluded, persons "acting under" federal officials are those who provide aid in law enforcement, such as a local police officer who accompanies a federal agent on a drug raid and acts under the federal agent's direction.

This is where Boeing sees its opening. It does not *just* follow regulations; it also certifies compliance with them and in the process reduces the size of the federal bureaucracy. An employee of the FAA who certified the airworthiness of Boeing's autopilot and autothrottle systems would be covered by §1442. Since the FAA has conscripted the regulated company's staff to perform those functions, Boeing maintains, it too comes within §1442.

The problem with this argument is the one we stated at the outset. *Every* regulated firm must use its own staff to

learn whether it has satisfied federal regulations. The staff of an electric utility running a coal-fired generation station must ensure that the equipment (much of it covered by detailed regulations) meets the EPA's specifications (and those of the host state) and is in working order. The staff also must monitor the stack gasses to ensure that the plant does not emit too much sulfur dioxide or particulate matter. It is a detail whether the firm sends the EPA a report (a "self-certification") of compliance, or instead sends reports only when it finds non-compliance, or sends no reports at all and waits for inspectors to appear. Likewise with safety apparatus (and safety inspections) under the Occupational Safety and Health Act and hundreds of other federal statutes. We do not see any correlation between the required certifications and acting-under status. The Supreme Court in *Watson* gave, as one example of someone obviously *not* "acting under" a federal agency, a person filing a tax return. 551 U.S. at 152. Yet the taxpayer must interpret and apply a complex statute and voluminous regulations, and the end of every return is a certification that this has been done and all income (and deductions) reported honestly. That process of self-reporting enables the IRS to have a smaller workforce, just as Boeing's procedures cut the FAA's payroll, but if taxpayers (and lawyers who certify that their briefs comply with rules) are not covered by §1442, neither is Boeing.

The list of people who have to certify things is exceedingly long. For example, every employer with a federal contract must certify that it has paid workers the prevailing wage. See 29 C.F.R. §§ 3.3, 3.4; *United States v. Clark*, No. 14-1251 (7th Cir. May 28, 2015). We doubt that the Justices would see a dispositive difference between certified compliance and ordinary compliance. Indeed, *Watson* rejected an argument

by the cigarette maker that a federal agency hadn't "just" required compliance with regulations but also had "delegated authority" to the manufacturer to determine compliance with those regulations. The Court thought that inadequate to make the manufacturer a person "acting under" the agency. 551 U.S. at 154–57.

Boeing replies that the relation between cigarette manufacturers and the Federal Trade Commission (the agency that regulated testing) was *faux* delegation, while its relation with the FAA is *real* delegation. Boeing points to 49 U.S.C. §44702(d)(1), which permits the FAA to conserve its resources by transferring some checking and certification functions to manufacturers, and the FAA used that power in Order 8100.9A. Note, however, that this is still a power to certify *compliance*, not a power to design the rules for airworthiness. The FAA permits Boeing to make changes to its gear after finding that the equipment as modified meets the FAA's standards; it does not permit Boeing to use gear that meets Boeing's self-adopted criteria.

When discussing the possibility that delegation might create "acting under" status, the Court mentioned rule making rather than rule compliance as the key ingredient, 551 U.S. at 157, and the FAA's order does not allow Boeing to change substantive rules. That some of the FAA's own rules are general—for example, §25.1309(b) says that "airplane systems and associated components, considered separately and in relation to other systems, must be designed so that … [t]he occurrence of any failure condition which would prevent the continued safe flight and landing of the airplane is extremely improbable"—does not confer on Boeing or other

manufacturers a power to make rules, as opposed to inter-
pret and apply them as best it can.

If the FAA gave Boeing a power to issue a *conclusive* certi-
fication of compliance, even though not to establish substan-
tive standards, the situation would come closer to what *Wat-
son* suggested might suffice. As far as we can see, however,
nothing that Boeing says is conclusive in the sense that a
court must treat its self-certification as establishing that its
flight-control systems *do* meet all federal rules. If the FAA
itself were to reach that conclusion, a court could not gainsay
the decision in a tort suit or under the Administrative Proce-
dure Act (unless, perhaps, the FAA's decision were arbitrary
and capricious). Boeing's self-certification does not have that
effect, however; it does not prevent either a court or the FAA
itself from taking a fresh look and reaching a contrary con-
clusion.

*Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1428
(11th Cir. 1996), supports Boeing's position. Boeing does not
identify, however, any post-*Watson* decision reaching a simi-
lar conclusion, for the FAA or any other agency that has del-
egated, not the power to make rules, but the power to certify
compliance with them. We think that *Magnin* is inconsistent
with *Watson* and cannot be considered authoritative. So we
agree with the district court that §1442 does not support re-
moval.

## II

Plaintiffs maintain that, once we reach this conclusion,
the appeal is done. That's because 28 U.S.C. §1447(d) reads:
"An order remanding a case to the State court from which it
was removed is not reviewable on appeal or otherwise, ex-

cept that an order remanding a case to the State court from which it was removed pursuant to section 1442 or 1443 of this title shall be reviewable by appeal or otherwise." Boeing's argument that §1442 supplies jurisdiction having been rejected, plaintiffs contend, there is nothing more for a court of appeals to do, for a district court's conclusion that federal jurisdiction does not exist is unreviewable. See, e.g., *Kircher v. Putnam Funds Trust*, 547 U.S. 633 (2006); *Gravitt v. Southwestern Bell Telephone Co.*, 430 U.S. 723 (1977).

Boeing offers a different take on the scope of federal jurisdiction. It observes that when a suit is "removed pursuant to section 1442" (as this was) the district court's "order" of remand is reviewable on appeal. To say that a district court's "order" is reviewable is to allow appellate review of the *whole* order, not just of particular issues or reasons. So *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996), holds with respect to 28 U.S.C. §1292(b), which permits a court of appeals to review an interlocutory order if the district court certifies that particular issues meet the statutory requirements. The Court held that although the district judge must find that important issues are presented and that their resolution could advance the case's disposition, once the appeal has been accepted the court of appeals reviews the "order" rather than just the issues. See also *Edwardsville National Bank & Trust Co. v. Marion Laboratories, Inc.*, 808 F.2d 648, 650 (7th Cir. 1987) (when a statute provides appellate jurisdiction over an order, "the thing under review is the order", and the court of appeals is not limited to reviewing particular "questions" underlying the "order"). Boeing maintains that §1447(d) should be understood the same way.

And so we *have* understood the relation between §1447(d) and an appeal that is an exception to its limit on review of remands. In *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446 (7th Cir. 2005), a district court remanded a class action that had been removed by a defendant that invoked the Class Action Fairness Act. The judge held that that Act did not authorize the removal and that the case was otherwise not within the scope of federal jurisdiction, and remanded. The Class Action Fairness Act authorizes appellate review of remands of cases that had been removed under its auspices. A court of appeals may accept an appeal of "an order of a district court" that has remanded after finding that the Act does not permit removal. 28 U.S.C. §1453(c)(1). After discussing the propriety of removal under the Act, we went on to decide that the suit *also* came within federal-question jurisdiction. That conclusion was consistent with §1447(d), *Brill* held, because, once the district court's "order" was before the court of appeals, all of the reasons the district court gave in support of that order were reviewable. 427 F.3d at 451–52. *Brill* relied on *Yamaha Motor* for this conclusion.

Section 1447(d) itself authorizes review of the remand order, because the case was removed (in part) pursuant to §1442. *Brill* establishes that once an appeal of a remand "order" has been authorized by statute, the court of appeals may consider all of the legal issues entailed in the decision to remand.

Once again another court of appeals has come to a contrary conclusion. *Jacks v. Meridian Resource Co.*, 701 F.3d 1224, 1229 (8th Cir. 2012), holds that, even when a statute authorizes review of a remand order, only the issue behind the exception to §1447(d) is reviewable; consideration of other is-

sues is blocked by §1447(d), the court stated. For this proposition, it cited—nothing. *Jacks* did not discuss the significance of the statutory reference to review of an "order." It did not mention *Yamaha Motor*. It did not mention *Brill*. And the omissions are understandable. The court pointed out, 701 F.3d at 1228, that neither side had cited authority or made a coherent argument. *Jacks* unknowingly created a conflict with *Brill*. The leading treatise supports *Brill*'s approach:

> Review should … be extended to all possible grounds for removal underlying the order. Once an appeal is taken there is very little to be gained by limiting review; the only plausible concern is that an expanded scope of review will encourage defendants to rely on strained arguments under [§1442 or] §1443 in an effort to support appeal on other grounds. Sufficient sanctions are available to deter frivolous removal arguments that this fear should be put aside against the sorry possibility that experience will give it color.

Edward H. Cooper, 15A *Wright & Miller Federal Practice & Procedure* §3914.11 (2014 rev.) (citations omitted).

We recognize that *Thermtron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976), and a few other decisions that went out of their way to find exceptions to §1447(d), are not admired these days at the Supreme Court. The holding of *Thermtron*—that a case remanded for reasons outside the scope of §1447(c) can be reviewed on appeal despite §1447(d)—is not supported by the text of §1447(d) and does not fit comfortably with the current Justices' approach to statutory interpretation. Decisions such as *Kircher*, which direct courts of appeals not to go behind a judge's stated reason for a remand, even if it seems clear that some other reason is responsible (or that the judge used words imprecise-

ly), show the Court's restiveness with the latitude *Thermtron* took with the statutory language. See also *Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 229–30 (2007) (strongly suggesting that *Thermtron* was wrongly decided); *Carlsbad Technology, Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 641–42, 642–43 (2009) (concurring opinions disparaging *Thermtron*).

Our application of *Yamaha Motor* and *Brill* to the word "order" in §1447(d) does not rely on *Thermtron*'s approach but is entirely textual. The Court remarked in *Kircher*, 547 U.S. at 641 n.8, that Congress has on occasion made the rule of §1447(d) inapplicable to particular "orders"—and for this the Court cited, among other statutes, §1447(d) itself. We take both Congress and *Kircher* at their word in saying that, if appellate review of an "order" has been authorized, that means review of the "order." Not particular reasons *for* an order, but the order itself.

This is not a matter of pendent appellate jurisdiction here any more than in *Yamaha Motor*. There is only one order and only one appellant, while pendent appellate jurisdiction involves an extra order, an extra appellant, or both. See *Swint v. Chambers County Commission*, 514 U.S. 35 (1995); *Clinton v. Jones*, 520 U.S. 681, 707 n.41 (1997); *Allman v. Smith*, No. 14-1792 (7th Cir. June 24, 2015), slip op. 3–4. If one "order" is the thing appealed, as *Yamaha Motor* and *Brill* concluded, nothing is "pendent" when considering all of the issues that led to the order. This is the same as the proposition that an appeal from a district court's order denying a Rule 59 motion brings up the whole judgment, without the need for a separate appeal of the original judgment. See, e.g., *Foman v. Davis*, 371 U.S. 178, 181 (1962). To appeal an "order" is to pre-

sent all issues that led to that order, without entailing any element of "pendent" jurisdiction.

If we go beyond the text of §1447(d) to the reasons that led to its enactment, we reach the same conclusion. The Supreme Court has said that §1447(d) was enacted to prevent appellate delay in determining where litigation will occur. See, e.g., *Kircher*, 547 U.S. at 640; *United States v. Rice*, 327 U.S. 742, 751 (1946). Since the suit must be litigated somewhere, it is usually best to get on with the main event. See also, e.g., *Van Cauwenberghe v. Biard*, 486 U.S. 517 (1988). But once Congress has authorized appellate review of a remand order—as it has authorized review of suits removed on the authority of §1442—a court of appeals has been authorized to take the time necessary to determine the right forum. The marginal delay from adding an extra issue to a case where the time for briefing, argument, and decision has already been accepted is likely to be small.

Some litigants may cite §1442 or §1443 in a notice of removal when all they really want is a hook to allow appeal of some different subject. But a frivolous removal leads to sanctions, potentially including fee-shifting, see 28 U.S.C. §1447(c), and after today it would be frivolous for Boeing or a similarly-situated defendant to invoke §1442 as a basis of removal. See *Martin v. Franklin Capital Corp.*, 546 U.S. 132 (2005); Fed. R. App. P. 38. What's more, a court may resolve frivolous interlocutory appeals summarily. See *Abney v. United States*, 431 U.S. 651, 662 n.8 (1977). A district judge may, after certifying that an interlocutory appeal is frivolous, proceed with the litigation (including a remand), see *Apostol v. Gallion*, 870 F.2d 1335 (7th Cir. 1989), and if the appeal is

frivolous the court of appeals will deny a motion for a stay, so the case can continue without delay.

### III

The relation between aviation accidents and the admiralty jurisdiction has been fraught ever since *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249 (1972), modified the former situs requirement and asked, not where a wreck ended up (land or water), but whether the events leading to the accident have enough connection to maritime activity. A plane had taken off from an airport adjoining Lake Erie, collided with a flock of gulls that gathered at the garbage dump off the end of the runway, settled back to earth in the heap of garbage, and was carried by its inertia into the lake, where it sank. The Justices thought that this had nothing to do with maritime affairs, even though the gulls may have made their living eating fish (in addition to refuse), and held the admiralty jurisdiction unavailable.

But the approach articulated in *Executive Jet* has caused problems. The price of throwing out one case that did not seem connected to maritime commerce was to unsettle the rules for many other cases with stronger connections. *Sisson v. Ruby*, 497 U.S. 358 (1990), suggested that the Justices had begun to rue the *Executive Jet* decision, and though it was not overruled the Court did hold that damage caused by a fire in the washer/dryer of a yacht tied up at a dock was within the admiralty jurisdiction. A few years later, the Court responded to the Great Chicago Flood—a hole in the bottom of the Chicago River introduced water to tunnels that carried it to basements throughout the Loop, causing injury inland—by holding that this event, too, was within the admiralty jurisdiction because the cause was maritime. *Jerome B. Grubart,*

*Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995). Again the result of *Executive Jet* survived, though the applicable legal standard changed.

The parties and the district court read the interaction of these decisions (and there are others that need not be mentioned) in three ways. Plaintiffs maintain that aviation accidents are outside the admiralty jurisdiction (unless perhaps a flying boat or float plane is involved); as fallbacks they contend that when the injury occurs on land there cannot be admiralty jurisdiction and that in any event a defendant cannot remove under the admiralty jurisdiction. Boeing contends that admiralty jurisdiction is available when an accident has a maritime cause, which Boeing understands to mean a cause that occurred while the plane was over navigable waters. The district court did not accept any of these approaches. Instead it held that admiralty jurisdiction is available only when an accident becomes inevitable while the plane is over water.

We start with the inevitability standard, which as far as we can tell lacks a provenance in the Supreme Court's decisions or in any appellate opinion. And it has the further problem of not supporting the judgment, because the choice between "cause" (Boeing's argument) and "inevitable cause" (the district court's holding) cannot affect the outcome.

As the district judge saw things, until the crash the pilots had only to rev the engines, pull up on the yoke, and execute a missed approach. Their failure to do this caused the accident, but hitting the seawall never became inevitable over water. When Boeing asked the district judge to reconsider, contending that the record did not support the judge's understanding of the facts, the judge replied that the record did

not show beyond all doubt that the plane was doomed at any moment while it was over navigable water.

Both the district judge's opinion and his order denying reconsideration were issued before the NTSB released its report, which concluded that by 10 seconds before impact a collision *was* certain; a 777 aircraft lacks the ability to accelerate and climb fast enough, no matter what the pilots did in the final 10 seconds. This means that, while the plane was over San Francisco Bay (part of the Pacific Ocean), an accident became inevitable. And the plaintiffs' own theory of liability pins a portion of the blame on Boeing because, about 4.5 nautical miles from the seawall, the autothrottle system disengaged—apparently without the pilots recognizing what had happened—and caused the plane to descend faster than the pilots appreciated. *NTSB Report* at 79–84.

The autothrottle system did exactly what it had been programmed to do. We have nothing to say about whether it should have been programmed differently, whether its design played a role in the accident, or whether Boeing should have done more to educate airlines (and their pilots) about how it would react when pilots issued the commands that Asiana's pilots did on the descent into San Francisco. But, if Boeing is liable at all, it must be because something about how this system was designed or explained created an unacceptable risk of an accident—and the system's performance (including the interaction between pilots and the automation design) occurred before the plane hit the seawall.

The district judge may have thought that federal jurisdiction depends on a high degree of certainty that jurisdictional facts exist. That seems to be the point of an "inevitability" approach, coupled with insistence on proof that relevant

facts and inferences be established beyond dispute. Yet the rules are otherwise. Jurisdictional allegations control unless it is legally impossible for them to be true (or to have the asserted consequences). See *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) (asking whether it "appears to a legal certainty" that the plaintiff cannot satisfy a jurisdictional requirement). That's equally true of a defendant's allegations in support of removal. See *Dart Cherokee Basin Operating Co. v. Owens*, 135 S. Ct. 547, 553–54 (2014). Given the NTSB's findings, it is possible for Boeing to show that this accident was caused by, or became inevitable because of, events that occurred over navigable water.

Is that sufficient? *Grubart* says that admiralty jurisdiction is available when an "injury suffered on land was caused by a vessel on navigable water", if the cause bears a "substantial relationship to traditional maritime activity." 513 U.S. at 534 (internal quotation marks omitted). This plane crossed the Pacific Ocean, a traditional maritime activity, and the cause of the accident likely occurred over the water. But an airplane is not a "vessel" and it was "over" rather than "on" the water. Does that make a difference?

Not functionally. An airplane, just like an ocean-going vessel, moves passengers and freight from one continent to another. It crosses swaths of the high seas that are outside of any nation's territory, and parts of the seas adjacent to the United States but outside any state's territory. It is a traditional, and important, function of admiralty law to supply a forum and a set of rules for accidents in international commerce. And *Executive Jet* itself said as much, though with a hedge, in remarking that a trans-ocean flight "might be thought to bear a significant relationship to traditional mari-

time activity because it would be performing a function traditionally performed by waterborne vessels". 409 U.S. at 271.

Before the Wright Brothers, admiralty jurisdiction necessarily was limited to vessels on navigable waters. Perhaps the invention of the submarine (under rather than on the water) was its first logical extension. When aircraft came along, courts had a lot of difficulty classifying them for many purposes. See Arthur R. Miller, 14AA *Wright & Miller Federal Practice & Procedure* §3679 (2014 rev.). But just as judges have not doubted that Congress can establish an air force even though the Constitution mentions only an army and a navy, so judges have concluded that airplanes over navigable waters should be treated the same as vessels—when a connection to maritime activity exists, as it didn't in *Executive Jet*.

*Executive Jet* treated it as settled that airplanes are within the scope of the Death on the High Seas Act, 46 U.S.C. §30302, which brings within the admiralty jurisdiction any death that is "caused by wrongful act, neglect, or default occurring on the high seas" more than three nautical miles from shore. 409 U.S. at 263–64. *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207 (1986), later applied that statute when a helicopter went down in the ocean. If accidents that occur because of a cause *over* the water are treated as *on* the water for the purpose of this statute, it is hard to see any stopping point—provided that the accident meets the functional requirements articulated in *Grubart*. For 28 U.S.C. §1333(1), which creates admiralty jurisdiction, does not mention vessels or demand that the cause or injury be "on" the water. It says only that district courts have jurisdiction of: "Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise

entitled." This is close to circular. District courts have admiralty jurisdiction in "[a]ny civil case of admiralty or maritime jurisdiction". That leaves only the *Grubart* standard, which as we have said is satisfied functionally.

True, we have in this litigation an accident apparently caused by events over water, but producing injury on land, and there's no tort without injury. Yet neither §1333(1) nor §30302 requires the whole tort to occur on the water. Section 30302 speaks of a *cause* on the water (or, after *Offshore Logistics*, over the water), and so does *Grubart*—for even if admiralty did not initially cover water-based causes of injury on land, it has done so ever since the Extension of Admiralty Jurisdiction Act, 46 U.S.C. §30101, on which *Grubart* relied to bring harm from the flooding of Chicago's basements within admiralty jurisdiction.

We are not saying that the Death on the High Seas Act applies to these cases. The plaintiffs do not rely on it. Section 30307(c) creates an exception to the Act for deaths that occur within 12 nautical miles of shore. Nor are we saying that a flight scheduled to take off and land within the United States drifts in and out of admiralty as it crosses lakes and rivers along the way. The Justices remarked in *Executive Jet* that for "flights within the continental United States, which are principally over land, the fact that an aircraft happens to fall in navigable waters, rather than on land, is wholly fortuitous." 409 U.S. at 266. That opinion wrapped up this way: "we hold that, in the absence of legislation to the contrary, there is no federal admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental United States." *Id*. at 274.

But Asiana 214 was a trans-ocean flight, a substitute for an ocean-going vessel—as flights from the contiguous United States to and from Alaska, Hawaii, and overseas territories also would be—and thus within the scope of *Executive Jet*'s observation that this situation "might be thought to bear a significant relationship to a traditional maritime activity". *Id*. at 271. The Supreme Court's holding in *Offshore Logistics* that an accident caused by problems in airplanes *above* water should be treated, for the purpose of §30302, the same as an accident caused *on* the water carries the implication that the general admiralty jurisdiction of 28 U.S.C. §1333(1) also includes accidents caused by problems that occur in trans-ocean commerce. Admiralty then supplies a uniform law for a case that otherwise might cause choice-of-law headaches.

Most appellate decisions on this subject since *Executive Jet* agree. See *Miller v. United States*, 725 F.2d 1311, 1315 (11th Cir. 1984) (flight from Bahamas to Florida is within admiralty jurisdiction); *Williams v. United States*, 711 F.2d 893, 896 (9th Cir. 1983) (flight from California to Hawaii is within admiralty jurisdiction); *Roberts v. United States*, 498 F.2d 520, 524 (9th Cir. 1974) (flight from California to Vietnam is within admiralty jurisdiction). The one exception, *United States Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd.*, 582 F.3d 1131 (10th Cir. 2009) (flight between Japan and Russia), stressed that the flight was not commercial; maybe the Tenth Circuit would find admiralty jurisdiction for commercial aviation such as Asiana 214. It is enough for us to say that we accept the majority position.

Plaintiffs tell us that, even if the events come within §1333(1), Boeing still was not allowed to remove the suits under 28 U.S.C. §1441(a). Yet that section permits removal of

any suit over which a district court would have original jurisdiction—and, if these suits are within the admiralty jurisdiction, that condition is satisfied. Plaintiffs' brief asserts: "admiralty jurisdiction does not provide a basis for removal absent an independent basis for federal jurisdiction. *Oklahoma ex rel. Edmondson v. Magnolia Marine Transp. Co.*, 359 F. 3d 1237, 1241 (10th Cir. 2004) (no removal of admiralty actions in the absence of independent basis for removal); *Morris v. TE Marine Corp.*, 344 F. 3d 439, 444 (5th Cir. 2003) (same); *In re Chimenti*, 79 F. 3d 534, 537 (6th Cir. 1996) (same); *Servis v. Hiller Sys. Inc.*, 54 F.3d 203, 207 (4th Cir. 1995) (same)." There plaintiffs stop; they don't explain why.

The appellate cases cited in this passage rely on *Romero v. International Terminal Operating Co.*, 358 U.S. 354 (1959), which took the saving-to-suitors clause at the end of §1333(1) to mean that plaintiffs who elect to litigate a common-law maritime claim in state court are entitled to keep their preferred forum, when the defendant is a citizen of the forum state, unless some other jurisdictional grant also applies and permits removal. To put this otherwise, *Romero* held that an admiralty claim under §1333 is not a federal-question claim under §1331, for federal questions always have been removable without regard to the defendant's citizenship or residence.

Oddly, however, plaintiffs do not mention the saving-to-suitors clause and do not cite *Romero* or any similar decision by the Supreme Court. Perhaps they have left them out because they no longer provide assistance. When the Supreme Court decided *Romero*, and when the courts of appeals decided the four cases on which plaintiffs rely, 28 U.S.C. §1441(b) said this:

> Any civil action of which the district courts have original juris-diction founded on a claim or right arising under the Constitu-tion, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

That's why it mattered in *Romero* whether a maritime case under §1333(1) counted as one arising under federal law (sentence one) or as an "other" action within federal jurisdic-tion (sentence two). The Court held in *Romero* that it was an "other" action. If the language had remained unchanged, it would matter to our case as well, for Boeing's headquarters are in Illinois. But in 2011 Congress amended §1441(b) to read:

> (b) REMOVAL BASED ON DIVERSITY OF CITIZENSHIP.—(1) In determining whether a civil action is removable on the basis of the jurisdiction under section 1332(a) of this title, the citizen-ship of defendants sued under fictitious names shall be disre-garded. (2) A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

Federal Courts Jurisdiction and Venue Clarification Act of 2011, §103, Pub. L. No. 112-63, 125 Stat. 759. This amendment limits the ban on removal by a home-state defendant to suits under the diversity jurisdiction.

Perhaps it would be possible to argue that the saving-to-suitors clause itself forbids removal, without regard to any language in §1441. But plaintiffs, who have not mentioned the saving-to-suitors clause, do not make such an argument. We do not think that it is the sort of contention about sub-

ject-matter jurisdiction that a federal court must resolve even if the parties disregard it. Our conclusion that §1333(1) supplies admiralty jurisdiction shows that subject-matter jurisdiction exists. Plaintiffs thus could have filed these suits directly in federal court (as many victims of this crash did). If the saving-to-suitors clause allows them to stay in state court even after the 2011 amendment, they are free to waive or forfeit that right—which given the scope of §1333(1) concerns venue rather than subject-matter jurisdiction. Boeing therefore was entitled to remove these suits to federal court.

## IV

One observation in closing. Our conclusions about admiralty jurisdiction, and the appellate-jurisdiction ruling that allowed us to consider the admiralty question, are compatible with the Multiparty, Multiforum Trial Jurisdiction Act of 2002, codified in 28 U.S.C. §1369 and §1441(e). This statute supplies federal jurisdiction when an accident with multistate features entails the deaths of 75 or more persons. Like most other grants of federal jurisdiction, it does not say that it is an exclusive means to federal court. A law granting one sort of jurisdiction does not implicitly negate others. See, e.g., *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691 (2003). No one doubts, for example, that if an air crash has only one victim, that person's estate could sue the plane's manufacturer under the diversity jurisdiction, 28 U.S.C. §1332, if they were citizens of different states. Likewise with the admiralty jurisdiction. Federal litigation in most air crashes will continue to rely on the diversity jurisdiction (potentially including the Class Action Fairness Act, §1332(d), if more than 100 injured persons pursue a class action or a mass action) or the Multiparty, Multiforum Trial Jurisdiction

Act; adding the possibility of admiralty jurisdiction when the cause of an accident occurs during a trans-ocean flight does not change the forum in which most aircraft suits are litigated.

The district court's decision is reversed, and the case is remanded with instructions to rescind the remand orders and transfer these cases to the Northern District of California for consolidated pretrial proceedings under 28 U.S.C. §1407, consistent with the decision of the Panel on Multidistrict Litigation.