**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARY RIGGS, as Personal Representative of the ESTATE OF JONATHAN NEIL UDALL, for the benefit of the ESTATE OF JONATHAN NEIL UDALL, and PHILIP AND MARLENE UDALL as Next of Kin and Natural Parents of JONATHAN NEIL UDALL, deceased,<br>    *Plaintiff-Appellee*,<br><br>v.<br><br>AIRBUS HELICOPTERS, INC.,<br>    *Defendant-Appellant*,<br><br>v.<br><br>MATTHEW HECKER; DANIEL FRIEDMAN; BRENDA HALVORSON; GEOFFREY EDLUND; ELLING B. HALVORSON; JOHN BECKER; ELLING KENT HALVORSON; LON A. HALVORSON; SCOTT BOOTH; PAPILLON AIRWAYS, INC., DBA Papillon Grand Canyon Helicopters; XEBEC LLC,<br>    *Defendants-Appellees*. | No. 18-16396<br><br>D.C. No. 2:18-cv-00912-JCM-GWF<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted February 14, 2019
San Francisco, California

Filed September 20, 2019

Before:  Mary M. Schroeder, Diarmuid F. O'Scannlain,
and Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Rawlinson;
Dissent by Judge O'Scannlain

## SUMMARY[*]

### Federal Officer Removal Statute

The panel affirmed the district court's order granting motions to remand to state court a case that had been removed to federal court pursuant to 28 U.S.C. § 1442(a)(1).

Following a fatal helicopter crash, plaintiffs filed suit in Nevada state court against the owners of the helicopter and the manufacturer, Airbus Helicopters, Inc.  Airbus removed the action to federal court on the basis of § 1442(a)(1), which permits removal of an action against "any officer (or any person acting under that officer) of the United States or of

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

any agency thereof, in an official or individual capacity, for or relating to any act under color of such office."

Federal Aviation Administration regulations set forth standards for certification of helicopters. Pursuant to 49 U.S.C. § 44702(d)(1), the FAA delegated to Airbus the authority to issue Supplemental Certificates for design changes to type-certified aircraft.

Agreeing generally with the Seventh Circuit, and applying *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007), the panel held that Airbus failed to meet the "acting under" requirement of § 1442(a)(1) because, in issuing Supplemental Certificates pursuant to its FAA delegation, Airbus was merely complying with regulatory standards. The panel concluded that an aircraft manufacturer does not act under a federal officer when it exercises designated authority to certify compliance with governing federal regulations.

Dissenting, Judge O'Scannlain wrote that Airbus acted under a federal agency because it undertook duties on the FAA's behalf, and the majority's contrary holding misunderstood the FAA's regulatory regime and misapplied *Watson*.

## COUNSEL

Carter G. Phillips (argued), Sidley Austin LLP, Washington, D.C.; Yvette Ostolaza and Robert S. Velevis, Sidley Austin LLP, Dallas, Texas; David R. Carpenter, Sidley Austin LLP, Los Angeles, California; James J. Pisanelli and Todd L. Bice, Pisanelli Bice PLLC, Las Vegas, Nevada; for Defendant-Appellant.

Gary C. Robb (argued) and Anita Porte Robb, Robb & Robb LLC, Kansas City, Missouri; Lawrence J. Smith, Bertoldo Baker Carter & Smith, Las Vegas, Nevada; for Plaintiffs-Appellees.

Patrick J. Kearns (argued), Wilson Elser Moskowitz Edelman & Dicker LLP, San Diego, California, for Defendants-Appellees.

Lauren L. Haertlein, General Aviation Manufacturers Association, Washington, D.C., for Amicus Curiae General Aviation Manufacturers Association.

---

**OPINION**

RAWLINSON, Circuit Judge:

Appellant-Defendant Airbus Helicopters, Inc. (AHI) appeals the district court's order granting motions to remand to state court. AHI contended that it properly removed this case to federal district court pursuant to 28 U.S.C. § 1442(a)(1) (§ 1442(a)(1)). According to AHI, the district court erroneously determined that AHI did not satisfy the "acting under" requirement of § 1442(a)(1). Reviewing *de novo*, we affirm the judgment of the district court.

## I. BACKGROUND

In February, 2018, John Udall, a resident of the United Kingdom, was killed in a helicopter crash while touring the Grand Canyon. The helicopter (Crashed Helicopter) was

owned and operated by several of the Hecker Defendants[1] and manufactured by AHI.

Plaintiff-Appellee Mary Riggs (Riggs) filed this action in Nevada state court against AHI and the Hecker Defendants, alleging that the Crashed Helicopter was defectively designed because the fuel tank was not crash-resistant, and could not withstand an impact of a minimal or moderate nature without bursting into flames and engulfing the passenger compartment.[2]

AHI removed the case to federal district court, asserting § 1442(a)(1) as the basis for removal. That provision permits removal to federal court of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Riggs and the Hecker Defendants separately moved to remand the case to Nevada state court, on the basis that AHI did not meet the requirements of § 1442(a)(1).

---

[1] The named Hecker Defendants are: Matthew Hecker, Daniel Friedman, Brenda Halvorson, Geoffrey Edlund, Elling B. Halvorson, John Becker, Elling Kent Halvorson, Lon A. Halvorson, Scott Booth, and Papillon Airways, Inc., DBA Papillon Grand Canyon Helicopters, and Xebec LLC.

[2] In this appeal, the Hecker Defendants are Defendants-Appellees whose interests are aligned with the interests of Riggs.

While the motions to remand were pending before the district court, AHI moved to dismiss the lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(2) and (b)(6).[3]

The district court granted Hecker and Riggs's motions to remand. Noting that we have not directly addressed § 1442(a)(1) removal based on an FAA delegation, the district court relied primarily on the Seventh Circuit decision of *Lu Junhong v. Boeing Co.*, 792 F.3d 805 (7th Cir. 2015) addressing an almost identical situation. After applying the reasoning set forth in *Lu Junhong*, the district court ruled that AHI failed to meet the "acting under" requirement of § 1442(a)(1) because AHI's activities "pursuant to its [Federal Aviation Administration] delegation are rule compliance rather than rule making."

## II. STANDARD OF REVIEW

"We review *de novo* a district court's decision to remand a removed case . . ." *Corona-Contreras v. Gruel*, 857 F.3d 1025, 1028 (9th Cir. 2017) (citation omitted).

## III.    DISCUSSION

Before turning to the issue before us, we first review the statutory framework that sets the stage for our decision.

Congress has charged the Federal Aviation Administration (FAA) with regulating aviation safety in the United States pursuant to the Federal Aviation Act, 49 U.S.C. § 40101, *et seq*. *See Martin ex rel. Heckman v. Midwest Exp.*

---

[3] Because we affirm the district court's order granting the motions to remand, AHI's motion to dismiss is now moot.

*Holdings, Inc*., 555 F.3d 806, 808 (9th Cir. 2009). Pursuant to this authority, the FAA promulgated the Federal Aviation Regulations (FARs). *See* 14 C.F.R. § 1.1 *et. seq*. Standards for certification of helicopters, such as the Crashed Helicopter, are set forth in 14 C.F.R. § 27.1.

After demonstrating compliance with the FARs, an aircraft owner may obtain a certificate from the FAA approving the aircraft's design. *See* 49 U.S.C. § 44704(a)(1); 14 C.F.R. §§ 21.21, *et. seq*. The FAA requires a supplemental type certificate (Supplemental Certificate) for any design changes to a type-certificated aircraft. *See* 49 U.S.C. § 44704(b). Therefore, AHI could make no design change to the Crashed Helicopter absent the issuance of a Supplemental Certificate.

To help ameliorate the effect of the FAA's limited resources, 49 U.S.C. § 44702(d)(1) provides that the FAA "may delegate to a qualified private person . . . a matter related to–(A) the examination, testing, and inspection necessary to issue a certificate under this chapter; and (B) issuing the certificate." The Eighth Circuit has described this delegation approach as a means of "reducing governmental costs [and] eas[ing] the burden of regulation on the aviation community by expediting the issuance of requested certifications." *Charlima, Inc. v. United States*, 873 F.2d 1078, 1081 (8th Cir. 1989).

Pursuant to 49 U.S.C. § 44702(d)(1), the FAA instituted the Organization Designation Authorization (Designation) program to delegate to organizations, such as AHI, the FAA's authority to inspect aircraft designs and issue certifications. *See* 14 C.F.R. § 183.41. An FAA Designation "allows an organization to perform specified functions on behalf of the

Administrator related to engineering, manufacturing, operations, airworthiness, or maintenance." 14 C.F.R. § 183.41(a). In 2009, AHI became an FAA-certified Designation holder with authority to issue Supplemental Certificates.[4]

The ongoing dispute in this appeal is whether AHI satisfies the "acting under" prong of § 1442(a)(1). AHI contends that it was formally delegated legal authority from the FAA, and that this delegation establishes that it was acting under the federal government for purposes of § 1442(a)(1). As an FAA delegee, AHI asserts that it does more than merely comply with federal law–it assists in carrying out the FAA's duties. Acknowledging that it does not make or promulgate federal law, AHI argues that the district court erroneously relied on the holding from the Seventh Circuit requiring entities to demonstrate a engagement in rule-making rather than rule compliance to satisfy the "acting under" requirement of § 1442(a)(1).

As a private party, AHI must demonstrate that it was "involved in an effort to assist, or to help carry out, the duties or tasks of the federal superior" to satisfy the "acting under" requirement of § 1442(a)(1). *Fidelitad, Inc v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018) (citation and internal quotation marks omitted). The pivotal question then is

---

[4] The dissent references the recent crashes of the Boeing 737 Max to support the argument that Boeing is authorized to self-certify the safety of its fleet. *See Dissenting Opinion*, p. 24 n.2. However, in the aftermath of the tragic crashes, it became clear that the FAA was calling the shots, not Boeing. *See* Luz Lato, Michael Laris, Lori Aratani and Damian Paletta, *Democracy Dies in Darkness*, Washington Post (March 13, 2019) (reporting that the FAA grounded the 737 Max planes after a "recommendation" from Boeing).

whether AHI was assisting the FAA to carry out the FAA's duties or whether AHI was "simply complying with the law," which would not bring it within the scope of § 1442(a)(1). *Id*. at 1100.[5]

In *Watson v. Philip Morris Cos., Inc*., 551 U.S. 142, 145–47 (2007), the United States Supreme Court addressed § 1442(a)(1) in the context of a defendant tobacco company's contentions that its close working relationship with a federal agency that directed and monitored its activities constituted conduct that satisfied the "acting under" requirement. Rejecting this argument, the Court held that Philip Morris did not satisfy the "acting under" requirement of § 1442(a)(1). *Id*. at 157. In the Court's view, Philip Morris's mere compliance with federal regulations did not constitute "a statutory basis for removal." *Id*. at 153 ("A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal official."). According to the Supreme Court, the "acting under" requirement is not satisfied by mere compliance with a regulation "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored."[6] *Id*. The Court in *Watson* also noted that Philip

---

[5] The dissent notes that the FAA authorizes certification of others. *See Dissenting Opinion*, p. 28. However, that circumstance has zero effect on the legal analysis dictated by *Watson*.

[6] The dissent makes an effort to distinguish the controlling effect of *Watson* by focusing on the delegation by the FAA of authority to issue certificates. *See Dissenting Opinion*, pp. 29–30. However, as the Seventh Circuit cogently observed, several other industries, including the energy and health sectors, certify compliance without "acting under" the regulating agencies. *Lu Junhong*, 792 F.3d at 809–10. As the Seventh

Morris had never been delegated legal authority from a federal agency. *See id*. at 156.

Although we have not directly addressed removal under § 1442(a)(1) based on an FAA designation, we have addressed removal under § 1442(a) in other contexts. In *Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1245–47 (9th Cir. 2017), we considered whether the congressionally-authorized delegation of insurance claims administration by the United States Office of Personnel Management (OPM) to private insurers conferred federal officer status upon those private insurers for purposes of § 1442(a)(1). In *Goncalves*, the private insurer placed a subrogation lien on the proceeds of a settlement reached on behalf of Goncalves with Rady Children's Hospital. *See id*. at 1243. Goncalves filed a motion in state court to expunge the lien, and the private insurer removed the matter to federal court. *See id*. In determining whether removal was proper, we addressed the "acting under" provision of § 1442(a)(1). We explained that "[f]or a private entity to be 'acting under' a federal officer, the private entity must be involved in an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id*. at 1245 (citation omitted) (emphases in the original). We

---

Circuit observed: "We doubt that the Justices would see a dispositive difference between certified compliance and ordinary compliance. Indeed, *Watson* rejected an argument . . . that a federal agency hadn't 'just' required compliance with regulations but also had 'delegated authority' to the manufacturer to determine compliance with those regulations. The [Supreme] Court thought that inadequate to make the manufacturer a person 'acting under' the agency." *Id*. at 809 (quoting *Watson*, 551 U.S. at 154–57). We agree with the Seventh Circuit that the Supreme Court in *Watson* did not articulate a distinction between "certified" compliance and compliance generally. *Watson*, 551 U. S. at 151–52.

noted that the actions taken by the private entity "must go beyond simple compliance with the law and help officers fulfill other basic governmental tasks." *Id*. (citation and alterations omitted).

We ultimately concluded that the private insurer was "acting under" a federal officer. Not only did the OPM enter into a contract with the private insurer for a negotiated fee, the contract also authorized the insurer to pursue subrogation benefits that would otherwise be pursued by OPM. *See id*. at 1246–47. But for the actions of the private insurers, OPM would not be reimbursed when an employee successfully pursued a third-party for payment of healthcare expenses incurred by the employee. *See id*. at 1247. OPM delegated to the private insurer the authority to pursue subrogation claims on behalf of the government. *See id*. at 1247. Under these circumstances, we concluded that the private insurer was "acting under" a federal officer. *Id*. We reasoned that the pursuit of subrogation claims took the private insurer "well beyond simple compliance with the law and helped [federal] officers fulfill other basic governmental tasks. *Id*. (quoting *Watson*, 551 U.S. at 153) (alteration and internal quotation marks omitted).

We recently grappled with the "acting under" requirement of § 1442(a)(1) in *Fidelitad*, 904 F.3d 1095, and we included a thoughtful discussion of *Watson*.[7] In *Fidelitad*, a private company (Fidelitad) that sold drones in Latin America placed orders for the drones from a private drone manufacturer (Insitu). *See id*. at 1097–98. The sales in Latin America

---

[7] Our colleague in dissent contends that the majority opinion misapplies *Watson*. *See Dissenting Opinion*, p. 19. However, that contention completely ignores our similar analysis of *Watson* in *Fidelitad*.

required "export licenses from the federal government." *Id*. at 1098. The two companies subsequently had a falling out over the provisions in the export licenses. *See id*. Consequently, Fidelitad filed an action against Insitu asserting, among other claims, that Insitu improperly delayed shipment of Fidelitad's order. *See id*. at 1097. Insitu moved for removal under § 1442(a)(1), arguing that it was "acting under" the federal government because it delayed orders to Fidelitad to ensure that Fidelitad complied with federal export laws. *See id*. at 1098–100.

We held that in order to invoke § 1442(a)(1) removal, a defendant "must demonstrate that (a) it is a person within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a colorable federal defense." *Id*. at 1099 (citations and internal quotation marks omitted). We identified the "central issue" in the case as "whether Insitu was acting pursuant to a federal officer's directions" when denying shipment of the drones. *Id*. (internal quotation marks omitted). We described the "paradigm" of a private entity "acting under a federal officer" as an individual "acting under the direction of a federal law enforcement officer," such as a private citizen assisting in a law enforcement raid. *Id*. (citations and internal quotation marks omitted).

We focused on the fact that no federal officer directed Insitu to delay the orders. *See id*. at 1100. Nevertheless, Insitu maintained that it was "acting under" a federal officer because the delay was for the purpose of ensuring compliance with the International Traffic in Arms Regulation, 22 C.F.R. §§ 120–130, which governs the sale of military goods to foreign governments. *See id*. Citing *Watson* and *Lu*

*Junhong*, we reiterated that mere compliance with governing regulations "does not bring a private actor within the scope of the federal officer removal statute." *Id*.

We explained that *Watson* involved allegations that a cigarette company sold cigarettes that delivered more tar and nicotine than advertised. *See id*. The company removed the case on the basis that it was acting under the direction of a federal officer by using a required test protocol that was "closely monitored by the federal government." *Id*. We described the Supreme Court as unpersuaded by the company's position, noting its holding that removal was not appropriate even though "a federal agency directs, supervises, and monitor's a company's activities in considerable detail." *Id*. (citation and internal quotation marks omitted). According to our reading of *Watson* in *Fidelitad*, extensive "federal regulation alone" did not suffice to meet the "acting under" requirement of § 1442(a)(1). *Id*. We also observed that the Supreme Court's rationale in *Watson* counseled rejection of Insitu's argument regarding its stated attempts to not only comply with federal regulations, but to "also attempt[] to enforce specific provisions in Fidelitad's export licenses." *Id*. We recognized the Supreme Court's rejection in *Watson* of the notion "that a company subject to a regulatory order (even a highly complex order) is acting under a federal officer." *Id*. (quoting *Watson*, 551 U.S. at 152–53) (parallel citation and internal quotation marks omitted).

Finally, in *Fidelitad* we acknowledged that government contractors may "act under federal officers." *Id*. (citation omitted). But, we clarified, the government did not contract with Insitu and the regulation and export licenses did not "establish the type of formal delegation that might authorize

Insitu to remove the case." *Id*. at 1101 (quoting *Watson*, 551 U.S. at 156) (alteration omitted).

The dissent seeks to minimize the persuasive power of *Fidelitad* by commenting that a different statutory regime was involved. *See Dissenting Opinion*, p. 30 n.3. However, the dissent's summary comment elides the fact that we were confronted with the identical issue in *Fidelitad* that we resolve in this case, whether the "acting under" requirement of § 1442(a)(1) was satisfied. The dissent also fails to grapple with the reality that in *Fidelitad*, we cited with approval the Seventh Circuit's *Lu Junhong* decision. Finally, despite criticizing the precedent cited by the majority, the dissent did not, and cannot, cite one case from this circuit that supports its analysis of the "acting under" requirement. The best the dissent can muster is a case from the Eleventh Circuit, *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424 (11th Cir. 1996), decided eleven years prior to *Watson* and an argument from a Solicitor General that was rejected by the Supreme Court. *See Dissenting Opinion*, pp. 26–27.

Our analysis in *Fidelitad* is generally consistent with the approach taken by the Seventh Circuit in *Lu Junhong*, the case relied on by the district court. *Lu Junhong* involved a dispute over the design of a plane that broke apart during flight while landing in San Francisco. *See* 792 F.3d at 807. After being initially sued in state court, Boeing contended that it was entitled to removal under § 1442(a)(1) because it was "acting under" the authority of the federal government, having been granted the authority by the FAA "to use FAA-approved procedures to conduct analysis and testing required for the issuance of type, production, and airworthiness certifications for aircraft under Federal Aviation

Regulations." *Id.* at 807–08. Boeing's argument in *Lu Junhong* mirrors AHI's posture in this appeal.

The Seventh Circuit rejected Boeing's argument. *See id*. at 810. The court reasoned that "we know from [*Watson*] that being regulated, even when a federal agency directs, supervises, and monitors a company's activities in considerable detail, is not enough to make a private firm a person "acting under" a federal agency." *Id*. at 809 (citation and internal quotation marks omitted).

In discussing its rejection of Boeing's argument that it, unlike Philip Morris in *Watson*, possessed formal delegation from the FAA of the authority to certify compliance, the Seventh Circuit explained:

> [T]his [authority] is still a power to certify *compliance*, not a power to design the rules for airworthiness. The FAA permits Boeing to make changes to its gear after finding that the equipment as modified meets the FAA's standards; it does not permit Boeing to use gear that meets Boeing's self-adopted criteria.

*Id*. at 810 (emphasis in the original).

The Seventh Circuit interpreted Watson as requiring the delegation of "rule making" authority rather than "rule compliance" certification to meet the "acting under" standard. *Id*. The Seventh Circuit suggested that, at a minimum, Boeing would have to be delegated "a power to issue *conclusive* certification of compliance." *Id*. (emphasis in the original). Because Boeing's self-certification was not binding on either the FAA or a reviewing court, the Seventh Circuit

determined that Boeing did not come within the "acting under" provision of § 1442(a)(1). *See id*.

The district court in this case adopted the Seventh Circuit's "rule making-compliance" distinction in finding that AHI was not "acting under" a FAA delegation. Although we cited *Lu Junhong* with approval in *Fidelitad*, 904 F.3d at 1100, we notably did not incorporate the Seventh Circuit's rule-making-rule compliance dichotomy. Rather, we referenced *Lu Junhong* for the proposition that compliance with the law "does not bring a private actor within the scope of the federal officer removal statute" and neither does delegation of authority "to self-certify compliance with the relevant regulations." *Id*. (quoting *Lu Junhong*, 729 F.3d at 808–10).

We are persuaded by the consistent reasoning of *Watson*, *Goncalves*, and *Fidelitad* to conclude that the district court committed no error in finding that AHI was not "acting under" a federal officer by virtue of becoming an FAA-certified Designation holder with authority to issue Supplemental Certificates. AHI concedes that, as a Designation holder, it "must perform all delegated functions *in accordance with* a detailed, *FAA-approved* procedures manual specific to each [Designation] holder." (emphasis added). Language such as "in accordance with" and "FAA-approved" suggest a relationship based on compliance rather than assistance to federal officers. *Cf. Goncalves*, 865 F.3d at 1245–46 (noting that a private insurer was "acting under" a federal officer when it entered into a contract with a government agency to pursue third-party reimbursements). Importantly, one of the regulations circumscribing an FAA delegee's authority to certify provides that "each applicant *must allow* the FAA to make any inspection and any flight

and ground test necessary *to determine compliance* with the applicable requirements of this subchapter."**[8]**    14 C.F.R. § 21.33 (emphasis added).  This language explicitly denotes compliance and, as discussed, mere compliance with federal directives does not satisfy the "acting under" requirement of § 1442(a)(1), even if the actions are "highly supervised and monitored."  *Watson*, 551 U.S. at 153; *see also Goncalves*, 865 F.3d at 1245; *Fidelitad*, 904 F.3d at 1100.

AHI concedes that it cannot make design changes without approval from the FAA.  At oral argument, AHI even acknowledged that the FAA has the authority to rescind any action taken by AHI in connection with the certification process.  These facts demonstrate that AHI was duty-bound to follow prescriptive rules set forth by the FAA, thus falling within the "simple compliance with the law" circumstance that does not meet the "acting under" standard.  *Goncalves*, 865 F.3d at 1247; *see also Fidelitad*, 904 F.3d at 1100.  In sum, AHI's actions as an issuer of Supplemental Certificates fit squarely within the precept of mere compliance with regulatory standards and outside the "acting under" provision of 1442(a)(1).  *Watson*, 551 U.S. at 153.

We foreshadowed the outcome of this case in *Fidelitad*, noting with approval the determination in *Lu Junhong*, 792 F.3d at 808–10, that an "airplane manufacturer was not acting under a federal officer . . . although federal law gave the manufacturer authority to self-certify compliance with the relevant regulations."  904 F.3d at 1100.  In keeping with our analysis in *Fidelitad*, we hold that AHI was not acting under

---

**[8]** The dissent completely disregards this language requiring compliance with FAA regulations.  *See Dissenting Opinion*, pp. 29–30 (denying Airbus' compliance obligation).

a federal officer although federal regulations gave AHI authority to issue Supplemental Certificates in accordance with FAA regulations. *See id*. Although we agree generally with the holding of *Lu Junhong*, as we did in *Fidelitad*, we decline to adopt the rulemaking-rule compliance distinction articulated by the Seventh Circuit and relied on by the district court. *See Lu Junhong*, 792 F.3d at 810. We are content to rely on the more clearly articulated common analyses from *Watson*, *Goncalves*, and *Fidelitad* focusing on whether the private entity is engaged in mere compliance with federal regulations. *See e.g.*, *Fidelitad*, 904 F.3d at 1100.

Finally, AHI relies heavily on the district court decision of *Estate of Hecker v. Robinson Helicopter Co*., 2013 WL 5674982 (E.D. Wash. 2013). In *Hecker*, the plaintiff brought an action in state court, asserting state law claims for wrongful death, negligence, and products liability arising from a helicopter crash. *See id*. at *1. There, as here, the helicopter manufacturer removed the case to federal court under § 1442(a)(1), and the plaintiff moved to remand the case for lack of jurisdiction. *See id*. The district court held that the defendant's status as a Designation holder satisfied the "acting under" requirement. *Id*. at *2. However, not only is *Hecker* non-binding, it was decided before our decisions in *Goncalves* and *Fidelitad*.

## IV.    CONCLUSION

AHI inspected and certified its aircraft pursuant to FAA regulations and federal law and could not make any structural or design changes without the consent of the FAA. The Supreme Court decision in *Watson* and our decisions in *Goncalves* and *Fidelitad* fully support the proposition that AHI's mere compliance with federal regulations did not

satisfy the "acting under" requirement of § 1442(a)(1). We join the Seventh Circuit in concluding that an aircraft manufacturer does not act under a federal officer when it exercises designated authority to certify compliance with governing federal regulations.[9]

**AFFIRMED.**

---

O'SCANNLAIN, Circuit Judge, dissenting:

The federal officer removal statute authorizes a defendant in a state court civil action to remove the case to federal court if it is "acting under" a federal agency. 28 U.S.C. § 1442(a)(1). In this case, the Federal Aviation Administration ("FAA") "delegate[d]" to Airbus Helicopters, Inc. ("Airbus") the authority to issue "certificates" on the agency's behalf—certificates that the FAA must otherwise issue on its own before an aircraft can be lawfully flown. 49 U.S.C. §§ 44702(d)(1), 44704. Because Airbus undertakes these duties on the FAA's behalf, I conclude that Airbus "act[s] under" a federal agency within the meaning of § 1442(a)(1). I believe that our court's contrary holding misunderstands the FAA's regulatory regime and misapplies the Supreme Court's decision in *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007).

I respectfully dissent.

---

**[9]** Because we conclude that AHI failed to meet the "acting under" requirement of § 1442(a)(1), we need not and do not address any other arguments advanced by the parties on appeal. *See Fidelitad*, 904 F.3d at 1101 n.4.

I

This case turns on the interaction between two statutes: the Federal Aviation Act, *see* 49 U.S.C. § 40103 *et seq.*, and the federal officer removal statute, *see* 28 U.S.C. § 1442.

A

1

In the Federal Aviation Act, Congress charged the FAA with the duty to establish "minimum standards required in the interest of safety" for the "design, material, construction, quality of work, and performance of aircraft, aircraft engines, and propellers." 49 U.S.C. § 44701(a)(1). The FAA promulgated (and regularly revises) the Federal Aviation Regulations, which delineate such standards. *See* 14 C.F.R. § 1.1 *et seq.* Given the technological complexity of modern aircraft, these safety standards dictate an aircraft's design from its critical components to its smallest detail. For instance, a helicopter—or, in the FAA's parlance, a "rotorcraft"—must satisfy regulations covering everything from its "landing gear" to the "number of self-contained, removable ashtrays." *Id.* §§ 27.729, 27.853(c)(1).

Besides imposing substantive safety standards, the Act also creates a "multistep certification process to monitor the aviation industry's compliance." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 804 (1984). Before an aircraft can lawfully take flight, the FAA must issue a series of "certifications" or "certificates"—terms that the Act uses interchangeably. The first of these is called a "type certificate," which the FAA "shall issue" if it finds the aircraft "is properly designed and

manufactured, performs properly, and meets the regulations and minimum standards prescribed [by the FAA]." 49 U.S.C. § 44704(a)(1). Then, before the manufacturer can mass produce an approved design, it must obtain a "production certificate." *Id.* § 44704(c). To do so, the manufacturer must show that duplicates of the design will, among other things, "conform to the [type] certificate." *Id.* Finally, the owner of each aircraft must obtain an "airworthiness certificate" by showing that the aircraft "conforms to its type certificate and, after inspection, is in condition for safe operation." *Id.* § 44704(d)(1). It is illegal to operate an aircraft without an airworthiness certificate. *See id.* § 44711(a)(1).

Together, these certification requirements prohibit a manufacturer (or the aircraft's eventual owner) from altering an aircraft's design without the FAA's approval. Instead, if a manufacturer wishes to make changes, it must seek one of two possible certificates. If a "proposed change . . . is so extensive that a substantially complete investigation of compliance . . . is required," then the manufacturer must seek a new type certificate from the FAA. 14 C.F.R. § 21.19. For less significant changes, the holder of a type certificate may seek a "*supplemental* type certificate." 49 U.S.C. § 44704(b)(1) (emphasis added); *see also* 14 C.F.R. § 21.113. Like an ordinary type certificate, a supplemental certificate authorizes the holder then to seek production and airworthiness certificates for the modified design. *See id.* § 21.119.

2

Perhaps because of this elaborate certification process, Congress offered the FAA an unusual tool to ease its

regulatory burden: the authority to delegate its duties to the private sector. Specifically, the Act states:

> (d) DELEGATION.—(1) Subject to regulations, supervision, and review the Administrator may prescribe, the Administrator may *delegate* to a qualified private person . . . a matter related to (A) the examination, testing, and inspection necessary to issue a certificate under this chapter; and (B) issuing the certificate."

49 U.S.C. § 44702(d)(1) (emphasis added); *see also Varig Airlines*, 467 U.S. at 807 ("[T]he FAA obviously cannot complete this elaborate compliance review process alone. Accordingly, [the Act] authorizes the Secretary to delegate certain inspection and certification responsibilities to properly qualified private persons.").

Since 1927, the FAA and its predecessor agency have established programs delegating its certification authority to the private sector—either to individual engineers or to organizations. Establishment of Organization Designation Authorization Program, 70 Fed. Reg. 59,932, 59,932 (Oct. 13, 2005) (codified at 14 C.F.R. pts. 21, 121, 135, 145, 183) [hereinafter *ODA Rule*]. In 2005, the FAA exercised its authority under § 44702(d) to institute the Organization Designation Authorization ("ODA") Program, which "consolidat[es] and improve[s]" the "piecemeal organizational delegations" previously developed. *Id.* at 59,933.

Under such program, the FAA authorizes "ODA Holders" to "perform specified functions on behalf of the

Administrator." 14 C.F.R. § 183.41. ODA Holders act as "representatives of the Administrator," and when "performing a delegated function, [they] are legally distinct from and act independent of the organizations that employ them." *ODA Rule*, 70 Fed. Reg. at 59,933. Further, to become an ODA Holder, an organization must sign a memorandum of understanding promising to "comply with the same standards, procedures, and interpretations applicable to FAA employees accomplishing similar tasks." Federal Aviation Administration, *Organization Designation Authorization Procedures*, Order 8100.15, at A1-17 (2006) [hereinafter *ODA Order*].[1]

Since 2009, Airbus has been a "Supplemental Type Certification ODA." *Id.* ¶ 2–6, at 5. In this capacity, Airbus has the authority to "develop and issue supplemental type certificates . . . and related airworthiness certificates." *Id*. Airbus may issue such certificates both for its own aircraft or for those of other applicants. *See id.* ¶ 11–7, at 88. Although the FAA may revoke Airbus's ODA status or reconsider its issuance of a specific certificate, *see* 49 U.S.C. § 44702(d)(2)–(3), a certificate issued by Airbus carries the same legal consequence as one issued by the FAA: it gives the FAA's formal approval to the aircraft's design (in the case

---

[1] Order 8100.15 "establishes the procedures, guidance, and limitations of authority [the FAA] grant[s] to an organization" under the ODA Program. *ODA Order*, at i. Since 2006, the FAA has amended Order 8100.15, *see* Federal Aviation Administration, *Organization Designation Authorization Procedures*, Order 8100.15B (2018), but the 2006 version of the Order governed at the time of the subject helicopter's manufacture and sale.

of a supplemental type certificate) or the aircraft itself (in the case of an airworthiness certificate).**[2]**

B

The federal officer removal statute permits a defendant to remove to federal court a state court action brought against

> "[t]he United States or any agency thereof or any officer (*or any person acting under that officer*) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . ."

28 U.S.C. § 1442(a)(1) (emphasis added). In *Watson*, the Supreme Court held that a person "act[s] under" a federal officer or agency if his actions "involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." 551 U.S. at 152. Although a "private firm's *compliance* . . . with federal laws, rules, and regulations" does not itself satisfy the statute's "acting under" requirement, *id.* at 153 (emphasis added), a formal "delegation of legal authority" goes beyond the "usual regulator/regulated relationship," *id.* at 156–57. Thus, *Watson* counsels that the "delegation of legal authority . . . [to act] on the Government agency's

---

**[2]** In the aftermath of the recent crash of the Boeing 737 Max in Ethiopia, there seems to be some appetite on Capitol Hill to revisit the FAA's private-public partnership. *See* Thomas Kaplan, *After Boeing Crashes, Sharp Questions About Industry Regulating Itself*, N.Y. Times (Mar. 26, 2019); David Koenig & Tom Krisher, *The FAA's Oversight of Boeing Will Be Examined in Senate Hearings*, Time (Mar. 27, 2019). But until (and unless) such proposals become law, we must apply the statute as it presently exists.

behalf" satisfies § 1442(a)(1)'s "acting under" requirement. *Id.* at 156.

## II

Because the FAA delegates to ODA Holders its formal legal authority to issue certificates, I conclude, in respectful disagreement with the majority's analysis, that Airbus "act[s] under" the FAA.

## A

## 1

Beginning with the text, the Federal Aviation Act compels the conclusion that the FAA delegates formal legal authority to ODA Holders. By its own terms, 49 U.S.C. § 44702(d)(1) authorizes the FAA to "delegate" a "matter related to" the "examination, testing, and inspection necessary to issue a certificate" and "issuing the certificate." To "delegate" means to "give part of one's power or work to someone in a lower position within one's organization." *Delegate*, Black's Law Dictionary (9th ed. 2009); *see also Delegate*, Webster's Third New International Dictionary (unabr. ed. 1986) ("[T]o entrust to another: transfer, assign, commit <power *delegated* by the people to the legislature> <one may [*delegate*] one's authority to a competent assistant>"). Congress's use of "delegate" thus suggests that the FAA may transfer its *own* formal legal powers to private persons, and the rest of the statute accords with such interpretation. In 49 U.S.C. § 44702(a), for instance, Congress established that the "Administrator of the [FAA] may issue" the long list of certificates mandated by the Act. *See also* 49 U.S.C. § 44704 (same). Accordingly, the

responsibility to issue certificates falls in the first instance to the FAA, and it is *this* authority that § 44702(d)(1) allows the agency to "delegate."

Confirming Congress's mandate, the FAA itself describes the ODA Program as a delegation of legal authority. Under the program, ODA Holders like Airbus function as "representatives of the Administrator" and "perform[] a delegated function." *ODA Rule*, 70 Fed. Reg. at 59,933; *see also* 14 C.F.R. § 183.41 (similar). The ODA Order states that the program "delegate[s] certain types of authority to organizations," and that such designees "act on the FAA's behalf." *ODA Order*, ¶ 1–1, at 1. Further, these delegees "assist" the agency and "help carry out" its manifold "duties [and] tasks," *Watson*, 551 U.S. at 152 (emphasis removed), because the "[d]elegation of tasks to these organizations [allows] the FAA to focus [its] limited resources on more critical areas," *ODA Rule*, 70 Fed. Reg. at 59,933.

Altogether, Congress and the FAA expressly said—time and again—that the agency indeed "delegate[s]" to private persons (like Airbus) the authority to issue certificates, and *Watson* counsels that a "delegation of legal authority" satisfies § 1442(a)(1)'s "acting under" requirement. 551 U.S. at 154–57. It follows that Airbus "act[s] under" the FAA.

2

I am not alone in this view. The Eleventh Circuit came to the same conclusion in *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424 (11th Cir. 1996), and the Solicitor General has endorsed that court's holding. In its briefing for *Watson*, the Solicitor General argued that the defendant could *not* seek removal under the federal officer removal statute (as the

Supreme Court later held), but it cited *Magnin* to support the argument that "a private citizen delegated authority to inspect aircraft by the [FAA] acts under a federal officer in conducting such an inspection and issuing a certificate of airworthiness." Brief for the U.S. as Amicus Curiae Supporting Petitioners at 26, *Watson*, 551 U.S. 142 (No. 05-1284). "The critical point," the Solicitor General continued, "is that the individual acts on behalf of the FAA Administrator in conducting the inspection." *Id.*

B

Despite the clear evidence of delegation, the majority concludes that Airbus's actions as an ODA Holder constitute mere "compliance" with FAA regulations. *See* Maj. Op. at 16–18. With respect, I believe the majority is wrong.

1

The majority's critical error is that it conflates Airbus's two distinct roles as a manufacturer and as an FAA delegee. Specifically, an ODA Holder acts as *either* the regulated party *or* the regulator—depending on the specific function performed. It is true, of course, that all manufacturers—in their capacity *as* manufacturers—must comply with the FAA's numerous safety standards whenever they design or build an aircraft. But as an ODA Holder, the organization also acts as a "representative[] of the Administrator." *ODA Rule*, 70 Fed. Reg. at 59,933. In this capacity, the manufacturer is "legally distinct from" the organization, and its "authority . . . to act comes from an FAA delegation." *Id*. Put differently, the manufacturer doffs its "aviation industry hat" and dons its "FAA hat," and so clad, the ODA Holder exercises the *agency's* statutory authority to issue certificates.

Perhaps because the issuance of certificates so obviously constitutes an exercise of the FAA's governmental power, the majority seeks to recast the ODA Program as a "*self*-certification" regime. *See* Maj. Op. at 16–18 (emphasis added). The majority borrows such reasoning from *Lu Junhong v. Boeing Co.*, where the Seventh Circuit compared a manufacturer's authority to issue certificates to "a person filing a tax return" compelled to certify that he reported his income "honestly." 792 F.3d 805, 809 (7th Cir. 2015). Such "certified compliance," the court reasoned, was indistinguishable from other forms of "ordinary compliance" deemed insufficient to satisfy § 1442(a)(1). *Id.* at 810.

Once again, the majority—as *Lu Junhong* before it—evinces its misunderstanding of the regulatory regime. Although an ODA Holder issuing a certificate must ensure that the aircraft complies with the FAA's safety standards, the organization's issuance of the certificate does more; it stamps the FAA's imprimatur on the aircraft. In so doing, the ODA Holder exercises a power derived from the agency and independent from its responsibilities as a manufacturer. Indeed, the FAA authorizes ODA Holders like Airbus to issue certificates "to an applicant *other than* the ODA Holder"—thus confirming that such power cannot be reduced to *self*-certification. *ODA Order*, ¶ 11–6, at 88 (emphasis added). And because the nature of the certification authority should not fluctuate depending on *who* is granted the certificate, the mere fact that Airbus certifies its own aircraft has no bearing on whether it "act[s] under" the FAA.

In short, a true self-certification regime (as with the taxpayer attesting to his income) involves an affirmation that the regulated party completed *his* duty; an ODA Holder's

"certification" conveys the *agency's* formal approval to the aircraft.

2

The majority's flawed understanding of the ODA Program blinds it to the differences between this case and *Watson*. There, the defendant—Philip Morris—argued that the FTC had "delegated authority" to test cigarettes for tar and nicotine, and that it "'act[ed] under' officers of the FTC" when it conducted such testing. *Watson*, 551 U.S. at 154 (emphasis removed). But the Supreme Court "found *no evidence* of any delegation of legal authority from the FTC to the industry association"—the "fatal flaw" in Philip Morris's argument. *Id*. at 156 (emphasis added). Accordingly, the Court found no reason to treat "the FTC/Philip Morris relationship as distinct from the usual regulator/regulated relationship." *Id.* at 157.

Eager to fit this case into *Watson*'s mold, the majority casts Airbus as a regulated party complying (or self-certifying compliance) with FAA rules and regulations. *See* Maj. Op. at 16–18. But as shown, Congress and the FAA said that the FAA delegates "legal authority" to act "on the Government agency's behalf." *Watson*, 551 U.S. at 156. *That* delegation goes well beyond the "usual regulator/regulated relationship," *id.* at 157, and as a delegee Airbus "assist[s]" and "help[s] carry out" the duties and tasks of the FAA, *id.* at 152 (emphasis removed). Under the correct reading of *Watson*,

such a scheme satisfies § 1442(a)(1)'s "acting under" requirement. *Id.*[3]

## III

The federal officer removal statute allows those who labor on the federal government's behalf, and are therefore sued in state court, to have such case tried in a federal forum. In this case, the FAA authorized Airbus to issue certificates that the agency would otherwise issue on its own, and such delegation satisfies § 1442(a)(1)'s "acting under" requirement. Of course, it might seem strange that a manufacturer's participation in this private-public partnership would permit it to avoid state court; § 1442's core purpose, after all, is to give *federal* officials "a *federal* forum in which to assert *federal* immunity defenses." *Watson*, 551 U.S. at 150 (emphasis added). But the statute's text is broader still, and our court has discerned a "clear command from both Congress and the Supreme Court that when federal officers *and their agents* are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir.

---

[3] The Ninth Circuit cases that the majority cites do not support its conclusion. *See* Maj. Op. at 10–15 (citing *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237 (9th Cir. 2017), and *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095 (9th Cir. 2018)). Both cases apply *Watson* to statutory regimes quite different from the FAA's, and each decision's fact-intensive analysis defies extraction of a simple rule that resolves this case. The majority's broad assertion that the court in *Fidelitad* was "confronted with the identical issue" that we confront here is simply wrong, Maj. Op. at 14; *Fidelitad* did not address a situation where an entity had formally and explicitly been delegated authority to issue certificates on behalf of a federal agency, let alone the specific delegation that Airbus acts under here.

2006) (emphasis added). The clear consequence of Congress's handiwork is that FAA delegees perform the agency's tasks. Because Airbus is such a delegee, § 1442(a)(1) entitles it to a federal forum.

   I respectfully dissent.